Filed 4/19/22  Marriage of C.J. & T.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of C.J. and T.R. | D078273 |
| C.J., | |
| Respondent, | (Super. Ct. No. 17FL008621E) |
| v. | |
| T.R., | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Frank L. Birchak, Judge.  Reversed with directions.

Sidley Austin, David Ryan Carpenter, Andrew B. Talai, Alexandria Vanessa Ruiz; Paula C. Salazar; Community Legal Aid SoCal, Sarah Reisman, Michelle Kotval, Erica Embree, Janista Lee; for Appellant.

Winston & Strawn, Diana Hughes Leiden, Aaron Chase O'Dell, Nicole G. Malick; Amy C. Poyer, for California Women's Law Center, et al., as Amici Curiae on behalf of Appellant.

No appearance for Respondent.

C.J. and T.R. were married in July 2016. They separated two days later. The next year, C.J. petitioned for annulment of their marriage based on T.R.'s alleged fraud or, in the alternative, dissolution based on irreconcilable differences. Claiming his efforts to locate T.R. were unsuccessful, C.J. obtained a family court order authorizing service by publication. After T.R. did not appear at a court proceeding, the family court entered her default and granted a judgment of nullity based on fraud.

After T.R. became aware of the default judgment, she moved to vacate the judgment, arguing she did not have actual notice of the action. (Code Civ. Proc., § 473.5.)[1] In the alternative, T.R. sought relief based on mistake or surprise, maintaining she was in contact with C.J. by text message before and during the time he filed his petition but C.J. concealed it from her. The family court denied T.R.'s motion on the ground that her lack of notice was caused by her avoidance of service of process.

T.R. contends the court should have granted the motion on the grounds presented. She also contends the default judgment was void because C.J. made material misrepresentations in his application for a publication order.

We conclude the trial court abused its discretion by denying relief under section 473.5. T.R. did not have actual notice of the action, and the evidence does not support the court's finding that her lack of notice was caused by her avoidance of service of process. We therefore reverse.

FACTUAL AND PROCEDURAL BACKGROUND

C.J. filed a petition for annulment or dissolution and stated in a supporting declaration: "[T.R.] left and would not tell me where she was going. She has never returned and I do not know her whereabouts." C.J.

_____

[1] Subsequent statutory references are to the Code of Civil Procedure.

2

asserted that T.R.'s "whole purpose . . . in marrying [him] was to obtain documentation for a green card or to become a US citizen."

In May 2018, C.J. applied for an order authorizing service by publication in a San Diego County newspaper of general circulation. C.J. stated in a declaration he last saw or had contact with T.R. on the date of their separation, two days after their marriage. He maintained that T.R.'s "whereabouts" were "currently unknown." He said he had "been trying for some time to locate and serve" T.R. He had been unable to find her residence or business address. A private investigator submitted a declaration describing his efforts to locate T.R., including searching various databases and social media services. He said he was unsuccessful.

The trial court granted C.J.'s application for a publication order, and a San Diego newspaper published a copy of the summons to T.R. for four weeks in June 2018. After T.R. did not appear, the trial court in August 2018 entered a default judgment of nullity, based on C.J.'s allegations of fraud by T.R.

In October 2019, T.R. filed a motion to vacate and set aside her default and the resulting judgment based on her lack of notice under section 473.5, as well as her mistake or surprise.

T.R. said in her supporting declaration that she met C.J. online in June 2016. T.R. was living in Orange County, while C.J. lived in El Cajon, San Diego County. After about a month, C.J. said they did not need to "waste time dating" and asked T.R. to marry him. T.R. did not accept right away, but she eventually decided that C.J. was "the right person" for her. He had "well thought out plans for the future" and was willing to care for her autistic son. They were married in Las Vegas and returned to C.J.'s home in El Cajon. Two days later, T.R. left and returned to her home in Orange County.

3

She said she married C.J. in good faith but she left because C.J. "subjected [her] to battery, including physical violence and sexual violence, as well as extreme cruelty." T.R. lived at a domestic violence shelter in Orange County from December 2016 through February 2017, and she lived at a domestic violence nonprofit program in Los Angeles County from February 2017 through August 2017. After August 2017, T.R. lived in Orange County.

T.R. said she was in contact with C.J. from August 2017 through May 2018 but he did not tell her he was filing for divorce. T.R. provided copies of text messages they apparently exchanged before and during this period.

In January 2017, several months after their separation, C.J. pressured T.R. to return. For example, he wrote, "I want you to stop playing games start acting like a wife and make your husband happy get pregnant like we planned and make are family whole [*sic*]." He warned T.R. that "immigration" called him about their wedding, and they "[d]id not sound like they where [*sic*] happy or liked what was said." The next month, C.J. told T.R. he loved and needed her. C.J. sent text messages and called T.R., urging her to return to him.

In July 2017, the month before C.J. filed his petition for annulment or dissolution, he asked T.R. for her address. T.R. asked why, and C.J. answered, "Paperwork." T.R. responded, "Divorce?," but C.J. said, "Your bills." They continued to go back and forth until C.J. eventually demanded, in all capital letters, "GIVE ME YOUR ADDRESS." T.R. responded, "You are still the same[.] I'm so disappointed with you." T.R. asked if C.J. had filed for divorce, but he would not respond. C.J. eventually told T.R. she was "breaking the law" if she did not provide her address and "things will go very bad" for T.R. with immigration unless she cooperated.

4

Two months later, after C.J. filed his petition, T.R. asked if they were still married or if C.J. had filed for divorce. C.J. avoided the question, and his responses were unclear. T.R. said, "You are supposed to send me the divorce papers," but C.J. told her, "Get your own divorce." T.R. went on, "I don't need to since you already did," but C.J. appears to have denied doing so.

In April 2018, C.J. in messages repeatedly called T.R. his wife. T.R. asked, "Why you don't file divorce [*sic*]." C.J. said, "I cant i dont have your address [*sic*]." T.R. responded, "You don't need it," but C.J. went on, "And i dont want to [*sic*]."

In her declaration, T.R. said she first learned of the nullity or dissolution action in August 2019. She did not see the published summons. Except for the two days after their marriage, T.R. had not lived in San Diego County. C.J. was aware T.R. lived in Orange County and had no connections to San Diego other than him. T.R. maintained she would have rebutted

C.J.'s allegations of fraud if she had been aware of the action. She asserted she married C.J. in good faith and left him because of domestic violence.[2]

The trial court held a hearing on T.R.'s motion. Both C.J. and T.R. were present. The court asked C.J. why he said his last contact with T.R. occurred two days after their marriage, although they continued to correspond by text message. C.J. responded that was the last time he saw T.R. or knew her location.

The court in its ruling focused on T.R.'s refusal to provide C.J. with her address. It found that C.J.'s "statements about his inability to find" T.R. were accurate. T.R. "refused to provide [C.J.] information" about her location and "did not provide any alternative method for [C.J.] to obtain some form of address to send [her] documents or to have [her] served." The court denied T.R.'s motion based on a finding that T.R. "evaded the service of process" and agreed publication was the only way to serve her.

---

[2]     In her motion and declaration, T.R. said she had attached a proposed response to C.J.'s petition. It was not filed or lodged with the trial court. T.R. requests judicial notice of (1) a "return sheet" from the trial court clerk's office rejecting her attempt to lodge a document, (2) an unfiled notice of intent to lodge a 71-page exhibit consisting of communications between T.R. and C.J. or his daughter, and (3) T.R.'s unfiled proposed response to C.J.'s petition. We grant the request for judicial notice of the return sheet, which is an official act of the trial court, and we take judicial notice of its existence under Evidence Code section 452, subdivision (c). The return sheet shows the clerk rejected a document based on the clerk's misreading of the trial court case number. However, T.R. has not shown the remaining two documents are judicially noticeable. She argues that the documents are court records under subdivision (d) of the statute. We disagree. These documents are not court records; they were not filed or lodged in any court. T.R. points out the documents are on Judicial Council forms. But this fact alone does not make them court records.

6

DISCUSSION

Section 473.5 provides for relief from default when service of a summons has not resulted in actual notice to a party in time to defend the action. (§ 473.5, subd. (a).) A motion under the statute "shall be accompanied by an affidavit showing under oath that the party's lack of actual notice in time to defend the action was not caused by his or her avoidance of service or inexcusable neglect." (§ 473.5, subd. (b).) The party must also serve and file "a copy of the answer, motion, or other pleading proposed to be filed in the action." (*Ibid*.) The motion must be filed within a reasonable time, but no later than two years after entry of default or 180 days after service of a written notice that the default or default judgment has been entered. (§ 473.5, subd. (a).)

"Trial court rulings on motions for relief from default are subject to an abuse of discretion standard." (*Luxury Asset Lending, LLC v. Philadelphia Television Network, Inc.* (2020) 56 Cal.App.5th 894, 907.) We consider whether the trial court's "decision exceeded the bounds of reason in light of the circumstances before the court. [Citation.] In doing so, we determine whether the trial court's factual findings are supported by substantial evidence [citation] and independently review its statutory interpretations and legal conclusions." (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1230.)

"Even so, '[w]ith respect to setting aside a default judgment, it is the policy of the law to favor, whenever possible, a hearing on the merits, and appellate courts are much more disposed to affirm an order where the result is to compel a trial on the merits than they are when the judgment by default is allowed to stand and it appears that a substantial defense could be made.' "

7

(*Luxury Asset Lending, LLC v. Philadelphia Television Network, Inc.*, *supra*, 56 Cal.App.5th at pp. 907-908.)

Based on our review, the trial court abused its discretion by denying T.R.'s motion under the circumstances here. T.R. established each element required for relief under the statute. First, T.R. did not have actual notice of the nullity or dissolution action. (§ 473.5, subd. (a).) " '[A]ctual notice' " means "genuine knowledge of the party litigant," as opposed to imputed or constructive notice. (*Rosenthal v. Garner* (1983) 142 Cal.App.3d 891, 895.) In her declaration, T.R. states she was unaware of the action until August 2019, two years after the default judgment. Based on their text messages, T.R. seemingly believed C.J. would file for divorce at some point. But, in response to T.R.'s questions, C.J. denied he had filed and told T.R. to "[g]et your own divorce"—even though C.J. had filed his petition two months earlier, and concealed the existence of the action. Moreover, even if T.R. had suspected C.J. filed his petition, any "fragmentary" and "unconfirmed" statements to that effect were insufficient to provide T.R. with actual notice under the statute. (See *Olvera v. Olvera* (1991) 232 Cal.App.3d 32, 41 [affirming a finding of no actual notice, where the defendant was aware of the lawsuit but not the specific claims against her].)

Second, T.R.'s lack of notice was not caused by her avoidance of service, and the trial court's contrary finding is not supported by the evidence. (§ 473.5, subd. (b).) T.R. was in contact with C.J. and did not avoid communications from him. C.J. demanded T.R.'s address, but he did not say it was for service of process. C.J. claimed he could not file for divorce without her address—even though C.J. had already filed his petition. When T.R. told C.J. he did not need her address, he replied he did not want to file for divorce, thereby cutting off any discussion about methods of service. T.R. was not

8

required to simply give C.J. her address, nor was her residence address necessary for service of process. T.R. could have accepted personal service in a public place, for example. And, rather than concealing it, C.J. could have told T.R. by text message that the action was pending. We note that T.R. may have had valid reasons to keep her address confidential from C.J., including because she was living at a domestic violence shelter (see Pen. Code, § 273.7, subd. (a) [prohibiting "malicious[ ]" disclosure of a shelter's location]) or because she feared for her safety based on her past interactions with C.J. T.R.'s refusal to provide C.J. with her address does not support a finding she was avoiding service of process under the circumstances here. (Cf. *Rios v. Singh* (2021) 65 Cal.App.5th 871, 876-877, 883 [describing a defendant's efforts to avoid service of process, including failing to acknowledge receipt of mailing, refusing to meet with a private investigator, threatening retaliation if the lawsuit were not withdrawn, and affirmatively stating he would not cooperate with service of process].)[3]

Third, T.R. substantially complied with the statute's requirement that she provide a copy of her proposed answer to C.J.'s petition. (§ 473.5, subd. (b).) As one court explained in an analogous context, "Because the purpose of the proposed answer requirement is to provide the delinquent party with an opportunity to show good faith and readiness to answer the allegations of the

---

[3] For similar reasons, the record does not support a finding that T.R.'s lack of notice was caused by her inexcusable neglect. (§ 473.5, subd. (b).) On the contrary, T.R. consistently sought information from C.J. regarding a potential dissolution action, but C.J. concealed and misrepresented the fact that he had already filed one. " 'Unless inexcusable neglect is clear, the policy favoring trial on the merits prevails. [Citation.] Doubts are resolved in favor of the application for relief from default [citation], and reversal of an order denying relief results.' " (*Tunis v. Barrow* (1986) 184 Cal.App.3d 1069, 1079.)

complaint, courts have held substantial compliance to be sufficient. On this point, our Supreme Court observed: 'The plain object of the provision was simply to require the delinquent party seeking leave to contest on the merits, to show his good faith and readiness to at once file his answer in the event that leave is granted by producing a copy of the proposed answer for the inspection of his adversary and the court.' " (*Carmel, Ltd. v. Tavoussi* (2009) 175 Cal.App.4th 393, 402.) Here, although T.R.'s proposed answer is not properly a part of the record on appeal (see fn. 2, *ante*), the record shows she prepared a proposed answer and attempted to include it with her motion. This effort is sufficient to show substantial compliance. (See *Carmel*, at pp. 402-403 [reversing a finding of no substantial compliance where defendants attempted to file their proposed answer and proffered a copy at the hearing].) Moreover, even in the absence of a proposed pleading, T.R. substantially complied with the statute by stating in her declaration that her marriage was in good faith, she left because of C.J.'s physical and sexual abuse, and she would have contested C.J.'s petition if she had been aware of it. (See *Mechling v. Asbestos Defendants* (2018) 29 Cal.App.5th 1241, 1247 [a declaration may show a defaulted defendant has a meritorious defense].) Although the trial court does not appear to have considered this requirement, it would have been an abuse of discretion for the court to have denied relief on this basis.

Finally, T.R.'s motion was timely. (§ 473.5, subd. (a).) T.R. filed her motion within two months of learning about the default judgment against her. This interval is reasonable under the circumstances. And, because T.R. was not served with written notice of default, she had two years after entry of the default judgment to file her motion. (*Ibid*.) Her motion was filed within this period as well.

10

In sum, T.R. showed she had no actual notice of the nullity or dissolution action, her lack of notice was not caused by her avoiding service of process (or inexcusable neglect), she substantially complied with the statute's requirement of filing a proposed answer, and her motion was timely filed. Her motion should have been granted, and the trial court abused its discretion by denying it. In light of our conclusion, we need not consider T.R.'s alternative arguments for reversal.

## DISPOSITION

The order is reversed. On remand, the trial court is directed to (1) enter a new order granting T.R.'s motion, (2) set aside T.R.'s default and the default judgment, and (3) allow T.R. to defend the action. T.R. is entitled to her costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

11